```
                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
    - - - - - - - - - - - - - - - x
    MANSI REDDY BUSHIREDDY,
                                          CA No:  1:25-cv-01102-SLS
              Plaintiff,
                                          Washington, D.C.
                                          Monday, May 5, 2025
    v.                                    10:04 a.m.

    TODD M. LYONS,

              Defendant.
    - - - - - - - - - - - - - - - x
    _____

                   TRANSCRIPT OF EVIDENTIARY HEARING
            HELD BEFORE THE HONORABLE SPARKLE L. SOOKNANAN
                       UNITED STATES DISTRICT JUDGE
    _____
    APPEARANCES:
    For the Plaintiff:         BRADLEY BRUCE BANIAS, ESQ.
                               BANIAS LAW, LLC
                               602 Rutledge Avenue
                               Charleston, SC 29403
                               (843) 352-4272
                               brad@baniaslaw.com

                               STEVEN A. BROWN, ESQ.
                               REDDY NEUMANN BROWN, P.C.
                               10333 Richmond Avenue, Ste 1050
                               Houston, TX 77042
                               (713) 429-4793
                               steven@rnlawgroup.com

    For the Defendant:         HEATHER D. GRAHAM-OLIVER, ESQ.
                               JOHN CUONG TRUONG, ESQ.
                               U.S. ATTORNEY'S OFFICE FOR D.C.
                               555 Fourth Street, NW
                               Washington, DC 20530
                               (202) 252-2520
                               heather.graham-oliver@usdoj.gov
                               john.truong@usdoj.gov

    Court Reporter:            Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
                               U.S. Courthouse, Room 6718
                               333 Constitution Avenue, NW
                               Washington, DC  20001
                               (202) 354-3187
```

```
 1                     P R O C E E D I N G S
 2             THE COURTROOM DEPUTY:  This is Civil Matter
 3   25-1102, Mansi Reddy Bushireddy v. Todd M. Lyons.
 4             Starting with plaintiff's counsel, please identify
 5   yourself for the record.
 6             MR. BANIAS:  Good morning, Your Honor, may it
 7   please the Court; Brad Banias and Steven Brown for the
 8   plaintiffs.
 9             THE COURT:  Good morning, Counsel.
10             MS. GRAHAM-OLIVER:  Good morning, Your Honor, may
11   it please the Court; Heather Graham-Oliver on behalf of the
12   government.
13             THE COURT:  Good morning, Counsel.
14             All right.  We're going to start with the
15   government.  I hope everyone had a good weekend.  I have
16   read all of the many filings.  Thank you for getting them
17   done on short timelines.
18             So I've got a bunch of questions for you, Ms. --
19   is it Ms. Graham-Oliver?  Is that right?
20             MS. GRAHAM-OLIVER:  Yes, Your Honor.
21             THE COURT:  Or is it just Oliver?
22             MS. GRAHAM-OLIVER:  That's fine.
23             THE COURT:  Okay.  Great.
24             So I want to just zoom out from this case and talk
25   about this mass termination program.  I have been calling it
```

1  a mass termination program.  Now I see from the
2  administrative record that the government calls it the
3  Student Criminal Alien Initiative, so I just want to zoom
4  out and talk about that before we talk about the facts of
5  this case.
6              So tell me about this Student Criminal Alien
7  Initiative.  How did it come about?
8              MS. GRAHAM-OLIVER:  Your Honor, I do not know how
9  it came about.  It's not a program per se, but it's a name
10 that was given by ICE National Security Division staff to
11 this specific effort to scrub records from SEVIS through
12 NCIC to determine if there were any positive hits within
13 NCIC.
14             THE COURT:  So, Counsel, do you have your
15 declarant here to tell me about this if you don't know the
16 answer to how this program came about?  Does the government
17 have witnesses here to answer my questions about the
18 program?
19             MS. GRAHAM-OLIVER:  Your Honor, we do not have a
20 declarant here.  I can call the agency.  I do not have a
21 declarant here, no, Your Honor.
22             THE COURT:  Counsel, I know you were not before me
23 last week, but I assume Mr. Carilli briefed you and you
24 reviewed the transcript from the last proceeding about the
25 questions that I had and my request that you show up here

1     today prepared to answer them or bring someone who could
2     answer the questions.  Did you review that?
3              MS. GRAHAM-OLIVER:  Yes, Your Honor, I did.  Yes.
4              THE COURT:  And yet you're showing up here telling
5     me you don't know the answers to the questions, and your
6     declarant is not here.
7              MS. GRAHAM-OLIVER:  Your Honor, I don't know how
8     it came about; however, it's a name that was given by ICE
9     National Security Division staff.  And what happened is
10    that they said that they scrubbed the records from SEVIS
11    through --
12             THE COURT:  Counsel, we have another hearing at
13    11:30.  I'm going to give you a minute to talk to who you
14    need to talk to, and I would like you to have people here
15    who can answer the questions that I asked two weeks ago of
16    the government.  And then you can come back to the podium.
17             MS. GRAHAM-OLIVER:  Yes, Your Honor.
18             Are there any --
19             THE COURT:  And I will continue questioning you,
20    but I want to make sure that someone can show up here at my
21    next hearing to answer those questions.
22             MS. GRAHAM-OLIVER:  I'm going to have to go out
23    and make a phone call.
24             THE COURT:  Sure.
25             (Pause)

1    say I'm like a grad student, and I --
2            THE COURT:  No, I understand.  I just want to walk
3    through and understand how this works.  Stop me when you
4    think I'm wrong.
5            ICE ran these lists against the NCIC.  It
6    generated a long list.  How long was that list?
7            MR. HUDAK:  Mr. Watson, who just joined us,
8    probably has the number handy.  I believe it is -- I think
9    it was 6,400 names.  Is that correct, Mr. Watson?
10           THE COURT:  Why don't we turn to Mr. Watson since
11   he's here.  Thank you, Mr. Hudak.
12           Mr. Watson, thank you for coming.
13           MR. WATSON:  Good morning, Your Honor.
14           THE COURT:  Thank you, and thank you for joining
15   on short notice.  I'm not going to swear you in.  I'm just
16   looking for some answers to my questions that I am hoping
17   you can provide.
18           So I am trying to understand the Student Criminal
19   Alien Initiative, and I will start back at the beginning.
20   Tell me what you know about how this mass termination
21   effort, which is called in this email the Student Criminal
22   Alien Initiative, how did it come about?
23           MR. WATSON:  So, Your Honor, this initiative came
24   about following an examination of the executive order
25   regarding anti-semitism activities in the United States.

1        THE COURT: Oh.

2        MR. WATSON: So we went from noncitizen aliens
3   that were within the scope of the executive order on anti-
4   semitism, and we shifted from that focus then to F-1 and M-1
5   students that were currently studying in the United States.
6   And the question was with this population of students how
7   many of them have derogatory information known.

8        So the requirement was for us to run that
9   population of students through NCIC, and we did so. So the
10  rough order of magnitude for that population was just under
11  1.3 million F and M visa holders. And from that population
12  run, Your Honor, we came up with about 16,000 records that
13  showed a positive result in NCIC.

14       And from that 16,000, my division was responsible
15  then for checking the data against the actual records. And
16  from those checks of the 16,000, the population went down to
17  about 13,900. And then from that population, we then
18  brought it down to 6,400 individuals that had a positive
19  NCIC record or an encounter with law enforcement officers.

20       From that 6,000 --

21       THE COURT: Okay.

22       MR. WATSON: Yes, ma'am, I'm sorry.

23       THE COURT: Actually, finish with the numbers, and
24  then I'll go to my questions.

25       MR. WATSON: Yes, ma'am. So with that 6,400,

1  ma'am, we generated lists, and the lists were generated
2  based on what I'll call productivity in the day.
3           So we didn't do one list for the entire 6,400.  As
4  our contract staff went through the list and compared the
5  records against the SEVIS records and the identities, when
6  we had a confirmed match, we then categorized that
7  information on spreadsheets, and those spreadsheets were
8  provided to the Department of State Bureau of Consular
9  Affairs for action as deemed appropriate.
10          So --
11          THE COURT:  Okay.  Let's stop there, then, with
12 where you send stuff to the State Department.  Let me
13 understand your process.
14          So 1.3 million visa holders.  You matched that
15 against this NCIC list, and that came -- you came up with
16 16,000 records.  And then what kind of checks are your staff
17 doing with that 16,000?  Like how did you get the 16,000
18 down to 13,900, and then what additional checks are you
19 doing to get it down to 6,400?
20          MR. WATSON:  So the checks that were done on the
21 16,000 were to match the names and any PII, personally
22 identifiable information.  So there were instances where
23 there were not name matches due to misspellings in names or
24 due to misspellings in the NCIC records.  So our contract
25 staff is responsible for matching the NCIC record and the

1  person lists therein against the SEVIS record and the person
2  therein.
3      So if we had a positive match on a name and a date
4  of birth, then the second part to it was to see what the
5  NCIC record had in terms of an arrest encounter.  So if we
6  could see that there was an arrest based on an encounter
7  with the law enforcement officer whereby this student was
8  charged, the question was then what was the charge?
9      So we would check the NCIC record to see what was
10 entered by the arresting agency.  So it could be a charge
11 like shoplifting.  It could be a DUI.  Whatever charge we
12 saw applicable to that student we then put in a spreadsheet.
13     We also looked at whether or not there was a
14 disposition on the charge, whether or not it was a
15 conviction, whether or not it was unknown, whether or not it
16 was either dismissed or nolle prosse'd.  All of that
17 information, when it was available, was categorized on the
18 spreadsheet so that anyone seeing the spreadsheet would know
19 we have a match, this is the charge and, if the disposition
20 was known, what the disposition was.
21     My staff even went one step further internally to
22 color-code the individuals to show if there was a
23 disposition versus one that required additional
24 investigation versus one that did not have a disposition,
25 meaning dismissed or nolle prosse'd that was actionable.

1                THE COURT:  So why, if someone is arrested like
2     one of my plaintiffs -- I'm not making this up.  If someone
3     was arrested for violating a traffic law, the officer went
4     back, looked at the video, found out that that person, in
5     fact, did not violate the traffic law, it was a mistake so
6     thus never brought charges, so you're going to look that
7     person up.  It says arrested, no charges ever brought, and
8     that person stays on your list for potential termination
9     even though that person was mistakenly arrested or at least
10    it's clear to you from looking at NCIC that that person
11    never had had charges brought against them?
12               MR. WATSON:  So, ma'am, that wasn't a mass list of
13    terminations.  It was a list of referrals for State
14    Department consideration.  That's what the list was for, and
15    that's what we provided to the Department of State.
16               THE COURT:  Got it.  So you guys generated -- let
17    me ask my question again.
18               So you guys generated a list not for termination,
19    just to identify people who had any law enforcement
20    interactions, and those law enforcement interactions would
21    not actually lead to a termination of someone's F-1 status.
22    But you generate that list, and then you refer it to the
23    State Department because they've got a lot of discretion to
24    revoke visas, and then they decide what they're going to do.
25    Visas get revoked, and it comes back to you, and then you

1      terminate the SEVIS record, thus essentially like

2      terminating these people's F-1 status.

3              That was this Student Criminal Alien Initiative in

4      furtherance of the President's -- okay.

5              MR. WATSON:  The list that we generated -- I'm

6      sorry, Your Honor.  Forgive me.  I didn't mean to overspeak.

7              THE COURT:  No, go ahead.  You can finish.

8              MR. WATSON:  The list that we generated for State

9      Department consideration were those students that had a

10     record of a positive interaction with law enforcement.  It

11     was referred to the Department of State for their

12     consideration as it relates to their visa.

13             The results that were returned back to us by the

14     Department of State as to whether or not they either revoked

15     the visa or the visa had expired, okay, was then given to

16     us.  And based on the existence of derogatory information

17     and the request from the Department of State, the records

18     were terminated.

19             THE COURT:  Okay.  I now have a very clear

20     understanding of how this Student Criminal Alien Initiative

21     happened, and I thank you for answering those questions,

22     Mr. Watson.

23             Let me ask you a question I've been asking for a

24     long time.  The government's position, which the plaintiffs

25     clearly don't find credible, is that a SEVIS termination has

1   no impact whatsoever on a student's F-1 status here.  What
2   is the purpose of a SEVIS termination if it has no impact
3   whatsoever on students' F-1 status?
4            MR. WATSON:  It serves as a red flag and could
5   lead to further investigation by those having access to
6   SEVIS, and that includes academic institutions.
7            THE COURT:  And based on what you've seen,
8   academic institutions have, in fact, taken action based on
9   SEVIS terminations, kicking students out of classes,
10  terminating their OPT training programs, telling them they
11  can't -- they can no longer go to work, correct?
12           MR. WATSON:  Ma'am, I don't have that level of
13  granularity as it relates to those outcomes.
14           THE COURT:  Okay.  Thank you.
15           Let me ask you.  So everyone you got back from the
16  State Department having their visa revoked, you did the
17  SEVIS termination based solely on the revocation of the visa
18  or based on, as you call it, derogatory information in that
19  person's file, or both?
20           MR. WATSON:  Both.  But if the State Department
21  also requested the termination, we executed on that.
22           THE COURT:  So of the 6,000 people or so that went
23  over to the State Department, how many requests for SEVIS
24  terminations did you get back?
25           MR. WATSON:  I can't give you an exact number on

1    the request of terminations, but I can tell you that the
2    revocations were in excess of 3,200.
3              THE COURT:  Okay.  And did you only terminate
4    records where the State Department requested that you do so,
5    or did you also terminate records based on the derogatory
6    information you found in the NCIC system?
7              MR. WATSON:  Your Honor, we terminated records
8    that had visas revoked or at the recommendation of the
9    Department of State.  And that rough order of magnitude was
10   over 5,500 records that were terminated prior to the
11   issuance of TROs.
12             THE COURT:  So you did not terminate any records
13   based on your own assessment.  All of the terminations were
14   done based on either a request or a recommendation from the
15   Department of State.
16             MR. WATSON:  I know that the records that were
17   terminated were done under those two parameters.  I cannot
18   speak to anything outside of that, ma'am.
19             THE COURT:  Okay.  You are not aware of any
20   terminations that occurred in cases other than where the
21   State Department either revoked a visa or recommended
22   termination.
23             MR. WATSON:  That is correct, Your Honor.  I'm not
24   aware of anything beyond that.
25             THE COURT:  Okay.  Thank you, Mr. Watson.  I

1    appreciate you being here today.
2             MR. WATSON:  You're welcome, Your Honor.
3             THE COURT:  Okay.  Counsel, since we are well
4    behind, we are going to adjourn in this case.  I am going to
5    ask my courtroom deputy to call the next case on the
6    calendar.  I will enter an order in this case later this
7    afternoon.
8             MS. GRAHAM-OLIVER:  Thank you, Your Honor.
9             MR. BANIAS:  Thank you, Your Honor.
10            MR. HUDAK:  Your Honor, one question, if I may?
11            THE COURT:  Who is speaking?
12            MR. HUDAK:  This is Brian Hudak from the U.S.
13   Attorney's Office.
14            THE COURT:  Yes, Mr. Hudak.
15            MR. HUDAK:  Do you require Mr. Hicks and
16   Mr. Watson to stay on the line and be available for the next
17   hearing?
18            THE COURT:  No.  I am going to assume that all of
19   their answers would be the same in this hearing, so I don't
20   need them to stay.  Thank you for checking.
21            MR. HUDAK:  Great.  Thank you, Your Honor.
22            THE COURT:  And thank you, Mr. Hicks, as well for
23   being here.
24                 (Whereupon the hearing was.
25                  adjourned at 11:58 a.m.)

1       **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4       certify that the above and foregoing constitutes a true and

5       accurate transcript of my stenographic notes and is a full,

6       true and complete transcript of the proceedings to the best

7       of my ability.

8          Dated this 5th day of May, 2025.

9

10

                                    /s/Lisa A. Moreira, RDR, CRR
11                                  Official Court Reporter
                                    United States Courthouse
12                                  Room 6718
                                    333 Constitution Avenue, NW
13                                  Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL COURT REPORTER

 2                 I, LISA A. MOREIRA, RDR, CRR, do hereby
        certify that the above and foregoing constitutes a true and
 3      accurate transcript of my stenographic notes and is a full,
        true and complete transcript of the proceedings to the best
 4      of my ability.
             Dated this ^  day of ^ , 2025.
 5

 6

 7                                  /s/Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
 8                                  United States Courthouse
                                    Room 6718
 9                                  333 Constitution Avenue, NW
                                    Washington, DC 20001
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```