```
1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2      - - - - - - - - - - - - - - - x
       MANSI REDDY BUSHIREDDY,
3                                      CA No:  1:25-cv-01102-SLS
                    Plaintiff,
4                                      Washington, D.C.
                                       Monday, May 5, 2025
5      v.                              10:04 a.m.

6      TODD M. LYONS,

7                    Defendant.
       - - - - - - - - - - - - - - - x
8      _____

9               TRANSCRIPT OF EVIDENTIARY HEARING
          HELD BEFORE THE HONORABLE SPARKLE L. SOOKNANAN
10                  UNITED STATES DISTRICT JUDGE
       _____
11     APPEARANCES:
       For the Plaintiff:       BRADLEY BRUCE BANIAS, ESQ.
12                              BANIAS LAW, LLC
                                602 Rutledge Avenue
13                              Charleston, SC 29403
                                (843) 352-4272
14                              brad@baniaslaw.com

15                              STEVEN A. BROWN, ESQ.
                                REDDY NEUMANN BROWN, P.C.
16                              10333 Richmond Avenue, Ste 1050
                                Houston, TX 77042
17                              (713) 429-4793
                                steven@rnlawgroup.com
18
       For the Defendant:       HEATHER D. GRAHAM-OLIVER, ESQ.
19                              JOHN CUONG TRUONG, ESQ.
                                U.S. ATTORNEY'S OFFICE FOR D.C.
20                              555 Fourth Street, NW
                                Washington, DC 20530
21                              (202) 252-2520
                                heather.graham-oliver@usdoj.gov
22                              john.truong@usdoj.gov

23     Court Reporter:          Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
24                              U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
25                              Washington, DC  20001
                                (202) 354-3187
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  This is Civil Matter
 3     25-1102, Mansi Reddy Bushireddy v. Todd M. Lyons.
 4              Starting with plaintiff's counsel, please identify
 5     yourself for the record.
 6              MR. BANIAS:  Good morning, Your Honor, may it
 7     please the Court; Brad Banias and Steven Brown for the
 8     plaintiffs.
 9              THE COURT:  Good morning, Counsel.
10              MS. GRAHAM-OLIVER:  Good morning, Your Honor, may
11     it please the Court; Heather Graham-Oliver on behalf of the
12     government.
13              THE COURT:  Good morning, Counsel.
14              All right.  We're going to start with the
15     government.  I hope everyone had a good weekend.  I have
16     read all of the many filings.  Thank you for getting them
17     done on short timelines.
18              So I've got a bunch of questions for you, Ms. --
19     is it Ms. Graham-Oliver?  Is that right?
20              MS. GRAHAM-OLIVER:  Yes, Your Honor.
21              THE COURT:  Or is it just Oliver?
22              MS. GRAHAM-OLIVER:  That's fine.
23              THE COURT:  Okay.  Great.
24              So I want to just zoom out from this case and talk
25     about this mass termination program.  I have been calling it
```

1     a mass termination program.  Now I see from the

2     administrative record that the government calls it the

3     Student Criminal Alien Initiative, so I just want to zoom

4     out and talk about that before we talk about the facts of

5     this case.

6               So tell me about this Student Criminal Alien

7     Initiative.  How did it come about?

8               MS. GRAHAM-OLIVER:  Your Honor, I do not know how

9     it came about.  It's not a program per se, but it's a name

10    that was given by ICE National Security Division staff to

11    this specific effort to scrub records from SEVIS through

12    NCIC to determine if there were any positive hits within

13    NCIC.

14              THE COURT:  So, Counsel, do you have your

15    declarant here to tell me about this if you don't know the

16    answer to how this program came about?  Does the government

17    have witnesses here to answer my questions about the

18    program?

19              MS. GRAHAM-OLIVER:  Your Honor, we do not have a

20    declarant here.  I can call the agency.  I do not have a

21    declarant here, no, Your Honor.

22              THE COURT:  Counsel, I know you were not before me

23    last week, but I assume Mr. Carilli briefed you and you

24    reviewed the transcript from the last proceeding about the

25    questions that I had and my request that you show up here

36

```
1    you what you need to make a decision on the merits.  But

2    with not knowing what their new witness is going to say here

3    in ten minutes, I defer to the Court, Your Honor.

4              THE COURT:  Okay.  So we're going to -- we're

5    going to recess for five minutes and come back and hear from

6    the government's witness, and then I will let you know where

7    I am on the preliminary injunction and next steps.

8              MR. BANIAS:  Thank you, Your Honor.

9              THE COURT:  Thank you, Counsel.

10             (Recess taken)

11             MS. GRAHAM-OLIVER:  Your Honor, if I may?

12             THE COURT:  Yes, Counsel.

13             MS. GRAHAM-OLIVER:  We have identified two

14   individuals, Mr. Hicks, who will be testifying about how

15   long the State Department website regarding --

16             THE COURT:  Can you speak up, Counsel.  I can't

17   hear you.

18             MS. GRAHAM-OLIVER:  Sorry.  Mr. Hicks, who will be

19   testifying regarding the State Department website --

20             THE COURT:  Okay.

21             MS. GRAHAM-OLIVER:  -- and how long that has been

22   up.

23             THE COURT:  Okay.

24             MS. GRAHAM-OLIVER:  And Mr. Hammer, who will be --

25             THE COURT:  Mr. Who?  Can you spell that.
```

```
 1                MS. GRAHAM-OLIVER:  H-A-M-M-E-R.

 2                THE COURT:  Okay.

 3                MS. GRAHAM-OLIVER:  -- who will be testifying

 4      about the Student Criminal Alien Initiative.  So --

 5                THE COURT:  Okay.  And tell me their titles,

 6      please, Counsel.

 7                You don't know?  I can ask them.

 8                MS. GRAHAM-OLIVER:  Thank you, Your Honor.

 9                THE COURT:  Okay.  Are they in the waiting room?

10                THE COURTROOM DEPUTY:  They are not at this time,

11      Your Honor.

12                MS. GRAHAM-OLIVER:  They are not in the waiting

13      room as yet.

14                THE COURT:  Okay.  I thought they were going to be

15      available at 11:00, Counsel.

16                MS. GRAHAM-OLIVER:  Yes, we thought so as well.

17                THE COURT:  Where is the rest of your group?

18                MS. GRAHAM-OLIVER:  Outside making sure that they

19      are actually -- what time they will be here.  They were told

20      to be here at 11:00.  My apologies, Your Honor.

21                THE COURT:  Okay.  Can you please go find out what

22      time they're going to be here, because at this point --

23                MS. GRAHAM-OLIVER:  Yes.

24                THE COURT:  There's Mr. Truong.  Maybe he has the

25      answer.
```

```
 1              THE COURTROOM DEPUTY:  Your Honor, it appears
 2    someone just logged into the Zoom.  They're joining now.
 3              Hello, Mr. Hicks, can you hear me?  This is Nani,
 4    the courtroom deputy.
 5              (Pause)
 6              THE COURTROOM DEPUTY:  Mr. Hicks, can you hear me?
 7              MR. HICKS:  I can hear you.  Yes, Your Honor.
 8              THE COURT:  Good morning, Mr. Hicks.  Thank you
 9    for showing up on such short notice.
10              Can you just tell me your title, Mr. Hicks.
11              MR. HICKS:  Yes.  I'm the division chief over
12    external operations at the students and exchange visitor
13    program, SEVP.
14              THE COURT:  Okay.  And so do you work for ICE or
15    for the State Department?
16              MR. HICKS:  I work for ICE.  That's within ICE.
17              THE COURT:  Okay.  Thank you.
18              Ms. Graham-Oliver, you can have a seat.  You don't
19    have to stand the whole time.
20              So, Mr. Hicks, I understand you have information
21    for me about the statement on the website.  So on this
22    website it says that terminating a SEVIS record causes the
23    following:  Student loses all on and/or off campus
24    employment authorization.  How long has that statement been
25    on this government website?
```

1          MR. HICKS:  It has been on there for quite a

2    while, Your Honor.  I'm sorry, I didn't go back and see when

3    they put it on, but I believe it's been there for the last

4    probably ten years.

5          THE COURT:  Okay.  So your guess is it's been

6    there since like SEVIS got created, right?

7          MR. HICKS:  I'm not sure it's been there that long

8    because SEVIS in State came along later.  My time at SEVP

9    started in 2019.  Before that I was part of the Office of

10   the Principal Legal Advisor, and one of the portfolios I

11   oversaw was SEVP.  So I've only been familiar with SEVP

12   since 2012, and I've only been here since 2019.

13         THE COURT:  2019, okay.

14         So as long as you've been here, that statement has

15   been on the website.

16         MR. HICKS:  That's what I believe to be true, yes.

17         THE COURT:  Okay.  Thank you.

18         And so government counsel has told me today that

19   that statement is incorrect.  Is that also your belief?

20         MR. HICKS:  Just a little context in order to

21   answer that appropriately.

22         THE COURT:  Yes.

23         MR. HICKS:  So the vast majority of terminations

24   are done by schools.  For example, last year SEVP initiated

25   about six terminations.  We don't terminate very often.

```
 1                    THE COURT:  That's for 2024.

 2                    MR. HICKS:  That was 2024, correct.

 3                    THE COURT:  So six total across the country.

 4                    MR. HICKS:  About -- I haven't had enough time to

 5          check, but it's a handful, yes.  It's like a dozen or six,

 6          so that's correct.

 7                    THE COURT:  Okay.  And can I ask, what's the

 8          nature of those terminations?  What were the bases for

 9          terminating those six or 12?

10                    I'm not holding you to a number.  I take your

11          point to be it was a small number.

12                    MR. HICKS:  We typically only take action when

13          there's some kind of an emergency.  So in the last month an

14          example of this would be we got a call from a school or we

15          found out evidence that at a school a student was

16          threatening to kill a teacher; that he had guns; that he had

17          done things like this before.  And in that instance we will

18          terminate and go and immediately arrest, as we did with this

19          student, and that person's in removal proceedings.

20                    That's kind of -- that's a little bit over the

21          top, but that's when we take action.  People will threaten

22          to be disruptive, threaten violence, and we usually step in

23          then.

24                    THE COURT:  Can I --

25                    MR. HICKS:  There are other --
```

1          THE COURT:  Can I just ask one clarifying question

2     on that.  Why wouldn't the school terminate in that

3     situation?  Because I understand that the school does the

4     vast majority.  So in an emergency situation like that, why

5     does it come to you instead of the school?

6          MR. HICKS:  They may not have gotten the tip,

7     right?  So sometimes information comes to us --

8          THE COURT:  I see.

9          MR. HICKS:  -- from a tip, and we will take action

10    quickly without going through the -- let's get in touch with

11    the school official and go that way.

12         THE COURT:  Okay.  That makes sense.

13         Okay.  So you -- so the context is, like prior to

14    this most recent mass termination effort, you've only

15    terminated in a handful of cases like in emergency

16    situations.

17         MR. HICKS:  Correct.  That's when we terminate.

18         Now, the other thing that happens is we do call

19    the school if we have information that isn't sort of life-

20    threatening or violent.  We'll say, "So-and-so has been

21    arrested under this suspicion of something, you know.  Is

22    that something you want to take action, or are going to take

23    action on?"  That might be an off-campus assault, or it

24    might be something else that might get into student conduct.

25         THE COURT:  Right.

1    MR. HICKS:  And so the school -- we leave that in

2    their hands most of the time, to take that action.

3    THE COURT:  Yes.  Okay.

4    MR. HICKS:  And so that's why the website says

5    what it says.  The website is meant to be external facing.

6    THE COURT:  So --

7    MR. HICKS:  And I know --

8    THE COURT:  Go ahead.  Finish your answer.

9    MR. HICKS:  Go ahead, Your Honor.

10    THE COURT:  No, you finish your answer.

11    MR. HICKS:  So the numbers I have for this year

12    from January 20, 2025, to present, there have been about

13    36,000 terminations in SEVIS, and almost all of those have

14    been done by the schools.

15    Now, with this initiative, we did about 5,500

16    ourselves, which is obviously way more than we usually do,

17    and that was part of the initiative.  But that's obviously

18    why we're here, because you're seeing the impact.  And

19    obviously with the lawsuits, we're all seeing the impact.

20    THE COURT:  So I'm trying to understand this

21    statement then.  So you're saying in an emergency case like

22    the one you described, where you make a termination because

23    a student is violent and you have very credible reasons to

24    question the safety of others on campus, you make an

25    emergency termination.  In that case the student would lose

 1   all on and/or after campus employment.

 2            But --

 3            MR. HICKS:  Correct, but also when the school --

 4            THE COURT:  Yes, go ahead.

 5            MR. HICKS:  Go ahead.  I'm sorry.

 6            So if -- this is a website that's external facing,

 7   so the purpose is to kind of explain what the typical

 8   situation is to the student.

 9            The typical situation is the school has taken

10   action to terminate you, and therefore they have whatever

11   evidence they have that they -- you're no longer going to be

12   a student there, and that's what would trigger the loss of

13   employment and all these other things.

14            THE COURT:  Right.

15            MR. HICKS:  So that's --

16            THE COURT:  Okay.

17            MR. HICKS:  The website addresses that.  It

18   doesn't really address the initiative that we're here about

19   today.

20            THE COURT:  So a SEVIS termination does, in fact,

21   have an impact, and this website, you know, saying a student

22   loses all on and/or off campus employment is, in fact, true

23   when SEVIS is terminated either in an emergency situation

24   like you have done a handful of times last year, for

25   example, or when a school terminates.

1         Now, we are in some new era where the government

2    is itself terminating and has mass terminated thousands of

3    students, not in an emergency situation where you do an

4    analysis on a case-by-case basis and make a record that, in

5    fact, there's a reason to terminate a status, but you've ran

6    some program, identified students who have interacted with

7    law enforcement, and went ahead and just did mass

8    terminations of, by your count, 5,500 students.  You

9    understand that it's still a termination.  You're not doing

10    some different type of termination now.  You're just doing

11    it differently, but it's still a SEVIS termination, right?

12         MR. HICKS:  Yes, we have set their SEVIS record to

13    terminated, correct.

14         THE COURT:  Okay.  So I don't hear you to be

15    saying that this statement is incorrect, which government

16    counsel told me earlier, because, in fact, a SEVIS

17    termination does, in fact, result in the student losing all

18    on and/or off campus employment, which is why schools were

19    telling students you can no longer participate in, like, off

20    campus enrollment.  You can't do your OPT because that is

21    the result of a termination.  And the fact that the

22    government decided to change how it does terminations and,

23    in fact, terminate thousands of students without doing this

24    individualized assessment that up until this year you

25    started doing, like that doesn't change the effect of a

1   SEVIS termination.

2          MR. HICKS:  I think -- I do have to provide the

3   context that, you know, the loss of employment and

4   employment authorization addresses when the school is taking

5   this action, that when the government in this initiative

6   terminated and I think the declarations that have been filed

7   with various courts that -- they weren't my declarations,

8   but I've seen it -- the SEVIS termination has been -- is in

9   an immigration status determination.  It isn't a

10  determination that was made by an immigration judge.  And so

11  there is some confusion about exactly what needs to be done

12  when the government is terminating your SEVIS status, if

13  that means it has an immediate impact or not, because what

14  the declarations have been saying is it is not a status

15  determination.

16         And if the school felt whatever the conduct was --

17  there was an individualized assessment here to the extent

18  that people -- as I understand it, that people went through

19  the NCIC database.  And if there were hits in the database,

20  they said, okay, this is a person who has a hit of some

21  sort, a criminal hit or some other hit.  And that was the

22  determination that was made in conjunction with the

23  Department of State about these revocations; that it then

24  came back to the SEVP, and there was a list, and we were

25  told to terminate the names on the list.  And it happened

1    over the course of three weeks.

2        So I think the statement obviously merits a little

3    clarification, and I would, you know -- I'd be happy to

4    address those points.  But I -- you know, it is accurate if

5    the school has taken action against you, and you're no

6    longer a student, then you have to stop working.  That was

7    what was meant to be addressed here.  It isn't -- go ahead.

8        THE COURT:  I'm not sure, based on what I've heard

9    you say, that the statement needs a clarification.  You

10   can't have a different SEVIS termination consequence if the

11   school takes action or if the government takes action.  Like

12   it's just that what's happened in this Student Criminal

13   Alien Initiative is unprecedented, and it's not something

14   the government has ever done before, and because it wasn't

15   really thought through, as far as I can tell, the government

16   didn't really consider all the consequences of it, and it

17   resulted in mass chaos across the country and upending the

18   lives of students across this country, forcing students who

19   most of them don't have the means to hire lawyers to file

20   close to 100 lawsuits simply so they can go to school.

21       I had a plaintiff before me less than two weeks

22   ago who was mistakenly arrested by the police officer for

23   breaking a traffic law.  When they went back and looked at

24   the video, they realized that he did not, in fact, break the

25   traffic law, so the Texas Department of Public Safety never

47

```
 1    even charged him with a crime.  And yet on that basis, and
 2    on that basis alone, the United States government terminated
 3    his SEVIS record.  He lost his job.  His wife is about to
 4    have a baby in two months and fears a long list of
 5    consequences.  And that, I gather, was not the intended
 6    effect of the SEVIS system, and that's the system that all
 7    of you are standing up here defending to me today, and
 8    repeatedly have defended to me in the past couple of weeks,
 9    and you've defended over courts across this country.  I find
10    it completely shocking.
11            But, Mr. Hicks, I thank you for coming on short
12    notice.  That information was very helpful.  I suspected
13    that the statement had been on the website for an incredibly
14    long time, and I thank you for your testimony.
15            I believe Mr. Hammer is here to -- is that
16    Mr. Hammer on the line?
17            MR. HUDAK:  No, Your Honor; it's Brian Hudak from
18    the U.S. Attorney's Office.
19            THE COURT:  Is Mr. Hammer showing up, Counsel?
20            MR. HUDAK:  I have not received word from ICE
21    whether Mr. Hammer is showing up or another ICE
22    representative.  ICE has not yet gotten back to me on that.
23    I am following up with them.
24            THE COURT:  Mr. Hudak -- and I understand we have
25    a change in counsel.  So you are aware -- I assume you
```

48

1    are -- I had Mr. Carilli before me on this case two weeks

2    ago.  I asked him questions about this mass termination

3    program, which I now have a name for.  He told me he did not

4    have the answers.  He then showed up before me and told me

5    he was not instructed to answer the questions.  He then

6    clarified that he was not instructed and did not have the

7    answers, and I was really clear that when I set this hearing

8    I wanted him to show up like well-prepared to answer my

9    questions or bring someone who could.

10          And then I had a change of counsel, and

11   Ms. Graham-Oliver showed up and said she could not answer

12   those questions.

13          And now I have been waiting for a witness to show

14   up.  I heard that that witness would show up at 11:00, and

15   now we have no confirmation.

16          I understand you are handling a lot of cases right

17   now, but we're here in all these cases because the

18   government took action that's having a real impact on

19   people's lives.  And I am taking the time to be here, and I

20   scheduled this hearing two weeks ago, and so I am quite

21   surprised that the government can't answer my questions and

22   can't produce someone who can.

23          MR. HUDAK:  Yes, Your Honor.  I mean, what we did

24   in preparation for this hearing is we mined both the

25   transcripts for both this hearing and the TRO hearing in

```
1    this case and in the next case that you had scheduled for
2    11:30.  We've compiled a list of the questions based upon
3    our mining of those transcripts as to what your questions
4    were --
5              THE COURT:  Uh-huh.
6              MR. HUDAK:  -- at those hearings, and we found
7    answers for those questions.  Ms. Graham-Oliver and Mr.
8    Truong at 11:30 are prepared to answer the questions that
9    you had on the transcripts there.
10             THE COURT:  Okay.
11             MR. HUDAK:  There are additional questions --
12             THE COURT:  Okay.  Mr. Hudak, I'm just going to --
13   I did not ask additional questions, and I actually have here
14   my notes from that hearing, which are the questions I
15   started to ask Ms. Graham-Oliver, and the very first
16   question I asked Mr. Carilli was:  Mr. Carilli, can you
17   start by telling me about the recent terminations in SEVIS
18   that appears that there's a recent mass termination by the
19   government?  How did that mass termination effort come
20   about?
21             I asked Ms. Graham-Oliver.  I said:  Well, now, I
22   know the name of that based on the three pages of your
23   administrative record.  And I said:  Tell me about this
24   Student Criminal Alien Initiative.  Tell me about that
25   program.  Tell me about how it came about.
```

50

1          And she said she could not answer that question,

2     which is why I asked for someone from the agency to be here

3     to tell me about that program.

4          MR. HUDAK:  So it's my understanding that we filed

5     notices of a supplement last night that included the *Patel*

6     transcript where Mr. Watson testified extensively about the

7     origins of the program and how it was implemented with the

8     Department of State, including linking it to the email

9     correspondence that should be in the administrative record

10    before the Court.  That's how the program came about

11    because, as Mr. Hicks said, it's an initiative that was led

12    by -- that was directed by his in coordination with the

13    State Department, and that the email correspondence plays

14    out exactly how that transpired to get to the point in time

15    where ICE terminated approximately 5,500 SEVIS records.

16          THE COURT:  So, Mr. Hudak, you're telling me you

17    filed a transcript that -- of another case.  Did your

18    attorney who filed it read the transcript such that she can

19    answer my questions?

20          MR. HUDAK:  I am fully confident that Ms. Graham-

21    Oliver, one of the deputy chiefs in our division, in the

22    civil division of the U.S. Attorney's Office, has read the

23    *Patel* transcript and is prepared to answer your questions.

24          THE COURT:  Okay.  So let's try this again because

25    she could not answer my first question and told me that

1    someone from the agency would have to answer those

2    questions.  And if you're telling me I need to go read a

3    transcript and get the answers to my questions, and that

4    someone from the government can't answer those questions

5    themselves, I find that to be unacceptable.

6          MR. HUDAK:  Well, I can certainly answer your

7    questions.

8          THE COURT:  Okay.  Let's do it then.

9          MR. HUDAK:  Mr. Hicks is also here and raising his

10   hand and has an ability to answer questions as well.

11         THE COURT:  Okay.  I'm happy to hear from whoever

12   can answer those questions.  Ms. Graham-Oliver told me

13   Mr. Hicks could answer those questions about the State

14   Department website, and Mr. Hammer would be able to answer

15   my questions about these mass terminations.  If Mr. Hicks

16   can answer them, even better.  And if you know the answers,

17   Mr. Hudak, you can answer them, too.

18         So why don't I ask them, and why don't I start

19   with Mr. Hicks since he's here from the agency.  And if he

20   doesn't know any answers to some of these questions, we can

21   move on, and then I'll turn to you, Mr. Hudak, and see if

22   you can answer those question.  And then we'll see where we

23   are, and maybe we don't need Mr. Hammer.

24         MR. HICKS:  If I could just offer one quick

25   thought, Your Honor.

1        THE COURT:  Go ahead, Mr. Hicks.

2        MR. HICKS:  I wanted to mention that in the last

3    week we've turned all these people back to active in SEVIS.

4    So you may be aware of that; you may not be --

5        THE COURT:  No, I am aware of that, and I -- I

6    mean, this plaintiff was turned back to active based on my

7    TRO, and I've got a filing saying that they would have been

8    turned back to active anyway, Mr. Hicks.  It has had a huge

9    impact on these people's lives, and it's the result of 100

10   of them having to pay attorneys and come to court just so

11   they could go to school, and time by judges across this

12   country to sit and hear these cases, and it's the result of

13   TRO after TRO after TRO because the government terminated

14   thousands of people, and based on what I've seen, without

15   actually doing any real checks into whether these people

16   should have been terminated.  So let me just go back to my

17   general questions about this.

18        So I have been calling it, before Mr. Carilli,

19   this mass termination effort because that's what it looked

20   like to me based on all the lawsuits getting filed.  I have

21   three myself.  So as I now understand, it's like the Student

22   Criminal Alien Initiative.  So tell me how this came about.

23        Ms. Graham-Oliver said some staff attorney made up

24   that name -- not attorney, I take that back -- some staff at

25   ICE made up this name, Student Criminal Alien Initiative.

1     But tell me how it came about.  What do you know about that?

2          MR. HICKS:  Your Honor, I don't know anything

3     about where that started, how that came about.

4          THE COURT:  Okay.  Mr. Hudak, do you know anything

5     about how that program came about?  Because that is the very

6     first question that I asked Mr. Carilli.

7          And I understand in preparation you guys sat down

8     and looked at the transcript to pull out my questions, but

9     that is the first question I asked him all three days that

10    he was before me two weeks ago.

11         MR. HUDAK:  And it's my understanding, Your Honor,

12    that this was an initiative that ICE undertook at the

13    direction of the HSI executive director to understand what

14    population of noncitizens that were in SEVIS had

15    interactions with law enforcement through NCIC.

16         THE COURT:  Okay.  And so.

17         MR. HUDAK:  And they compared the --

18         THE COURT:  Go ahead.

19         MR. HUDAK:  Then they compared the NCIC list with

20    the records in SEVIS and referred those matters to the

21    Department of State.

22         The State Department then did an effort to examine

23    those records, determined whether folks' visas should be

24    revoked, whether there was a request that SEVIS records

25    be terminated, and that proceeded along the lines that

1    **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8         Dated this 5th day of May, 2025.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

       I, LISA A. MOREIRA, RDR, CRR, do hereby
certify that the above and foregoing constitutes a true and

3

accurate transcript of my stenographic notes and is a full,
true and complete transcript of the proceedings to the best

4

of my ability.
    Dated this ^  day of ^ , 2025.

5

6

7

                      <u>/s/Lisa A. Moreira, RDR, CRR</u>
Official Court Reporter

8

United States Courthouse
Room 6718

9

333 Constitution Avenue, NW
Washington, DC 20001

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25